IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>SULAY LOPEZ, AZUCENA ELIZABETH MOLINA,<br><br>　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:11-CR-0186-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court is Defendant Azucena Elizabeth Molina's motion to suppress evidence seized during a search of the car driven by her co-defendant Sulay Lopez, during the course of a lawful traffic stop initiated by Trooper Jared Trooper Withers ("Trooper Withers") for speeding. (Dkt. No. 30.) Defendant Molina argues that suppression is required because Trooper Withers asked unrelated questions for the purpose and with the effect of unreasonably delaying the stop until Sergeant Salas could arrive with a K-9 unit trained to search for drugs. Because the delay was not unnecessarily prolonged, Defendant Molina's motion to suppress is denied.

## BACKGROUND

On February 23, 2011, at approximately 2:55 p.m., Trooper Withers pulled alongside Sergeant Steve Salas, who was running stationary radar at milepost 140 in the median on I-70, located in Spotted Wolf canyon. (Tr. at 13-15.) At approximately 2:59 p.m., Trooper Wither saw a white vehicle coming down the canyon traveling at 66 mph in a 60 mph zone. (Tr. 15-16.)

1

Trooper Withers pulled out and initiated a traffic stop and asked the driver, Ms. Lopez, if she had seen the speed limit sign at the top of the canyon, which changed the speed limit to 60 mph. (Tr. at 17.) Defendant Azucena Elizabeth Molina was a passenger. (Tr. at 23.) After Ms. Lopez responded that she had tried to slow down by pushing her brakes, Trooper Withers asked for her driver's license. (Tr. 17.) As Ms. Lopez was retrieving her license, Trooper Withers asked her where she was coming from and she said "Vegas." (Tr. at 17.) She told Trooper Withers they had been at the MGM Grand. (Tr. at 19.) She then provided a North Carolina license in the name of Ms. Lopez with a photograph on the license, which appeared to match the driver. (Tr. at 19-20.)

Trooper Withers also asked Ms. Lopez for the vehicle's registration and insurance card. (Tr. at 20.) As she was looking for those documents, Trooper Withers continued to talk with her. (Tr. at 20.) Ms. Lopez gave Trooper Withers an insurance card, but did not initially provide the registration. (Tr. at 20.) Trooper Withers asked for the registration again, and Ms. Lopez provided it. (Tr. at 20- 21.) The information on the registration was consistent with the information Trooper Withers had received earlier from his dispatcher. (Tr. at 21.) Trooper Withers noticed that the insurance card provided by Ms. Lopez had expired in December. (Tr. at 21.) He asked for a current insurance card, but she was unable to provide one. (Tr. at 21.) As Ms. Lopez was retrieving the registration and insurance cards, Trooper Withers asked additional questions about the trip to Vegas. (Tr. At 21.) He asked if Ms. Lopez had any family there and she said they did not and they did not rendezvous with family. (Tr. at 21.) Trooper Withers thought that Ms. Lopez was being vague. (Tr. at 23.)

After Ms. Lopez provided the vehicle registration, Trooper Withers asked her if she would come back to his vehicle with him. (Tr. at 22.) Ms. Lopez agreed, and Trooper Withers

assisted her in getting into the front passenger seat of the patrol car. (Tr. at 22.) Trooper Withers then got into the car as well. (Tr. at 22.) Trooper Withers began drafting a citation on the laptop in his patrol car. (Tr. at 22.) As Trooper Withers was filling out the citation, he continued to speak with Ms. Lopez, first asking about the purpose of her trip to Las Vegas. (Tr. at 22.) Ms. Lopez told him that she had just turned 21, had saved some money, and wanted to go to Las Vegas. (Tr. at 23.) She said she had wanted to go in January, but had been unable to go at that time. (Tr. at 23.) As he continued with the citation, Trooper Withers asked Ms. Lopez what she did for a living and she said she was a babysitter. She said she was paid $11 per hour. (Tr. at 23.) Trooper Withers asked Ms. Lopez where she and her passenger had stayed in Las Vegas and again she quickly said, "MGM." (Tr. at 23.) She told Trooper Withers that her passenger's name was "Susie" and, when Trooper Withers asked, Ms. Lopez told him Susie's last name was "Molina." (Tr. at 23.) Trooper Withers asked Ms. Lopez how long she had known Susie Molina and she said, "about a year." (Tr. at 23-24.) She then said that it had been a while and then stated, she had known Defendant Molina for about a year and a half. (Tr. at 24.) Trooper Withers thought that Ms. Lopez was being vague when she talked about her visit to Las Vegas. (Tr. at 24.) He again asked her what she had done there and she said they did not go to any shows, but just played and gambled the entire trip. (Tr. at 24.) Ms. Lopez also told Trooper Withers that the clubs were awesome, implying she had gone to some clubs, but gave no details. (Tr. at 24.)

Trooper Withers continued filling out the citation and, at approximately 3:04 p.m., he contacted his dispatcher to run Ms. Lopez's driver's license to check for any outstanding warrants and to run a criminal history check. (Tr. at 24-25.) Trooper Withers continued to draft the citation after contacting dispatch. (Tr. at 25.) As he did so, he also continued to talk to Ms.

Lopez, asking her further questions about her trip to Las Vegas. (Tr. at 25.) Trooper Withers asked her if she and Defendant Molina had spent all their time at the MGM, or if they had visited other casinos. (Tr. at 25.) Ms. Lopez said they had only stayed at the MGM and gambled. (Tr. at 25.) Trooper Withers asked Ms. Lopez how long she had been in Las Vegas and she hesitated before saying it had been "like a whole week." (Tr. at 25.) When Trooper Withers asked Ms. Lopez when she had arrived in Las Vegas she hesitated again and said, "like about a week ago." (Tr. at 25.) She then said she did not remember, but knew it had been two weeks since she had left North Carolina. (Tr. at 26.) Trooper Withers asked Ms. Lopez what day of the week she had arrived in Las Vegas, asking "Was it Monday?" and "Was it Wednesday?" (Tr. at 25.) Ms. Lopez said she did not know what day they arrived in Las Vegas. (Tr. at 25.) When asked what day she had left North Carolina, she could not remember. (Tr. at 25.) Trooper Withers then suggested the 18th or the 19th and Ms. Lopez agreed with him, saying it could have been the 18th or 19th. (Tr. at 26.) Those dates were inconsistent with Ms. Lopez's previous statement that she had left North Carolina approximately two weeks before. (Tr. at 27.) Trooper Withers confronted Ms. Lopez with the fact that the current date was February 23, which was only several days after the 18th and 19th, and Ms. Lopez stated that she did not even know that it was the 23rd. (Tr. at 28.)

During this conversation, Sergeant Salas arrived and began talking with Defendant Molina. (Tr. at 29-30, 89-90.) She said she was going to Colorado to ski. (Tr. at 90.) Salas asked where in Colorado she was going to ski, and Defendant Molina said she didn't know and then asked Salas, "Where do people ski in Colorado?" (Tr. at 90.) At this point, Trooper Withers had finished drafting the citation, but had not yet heard from dispatch regarding the inquiries he had made. (Tr. at 30.) He continued to talk to Ms. Lopez, asking her how much

4

money she lost in Las Vegas. (Tr. at 30.) Ms. Lopez said she lost everything she had, and then said she had $500 and lost $500. (Tr. at 30.) Her nervousness appeared to increase as Trooper Withers spoke with her about Las Vegas. (Tr. at 30.)

Trooper Withers asked Ms. Lopez if he could speak with her passenger and she told him that was fine. (Tr. at 30.) At approximately 3:07 p.m., about eight minutes after Trooper Withers initiated the stop, he got out of his patrol car and, as he approached the passenger side of the car, he passed Sergeant Salas. (Tr. at 31.) Trooper Withers asked Sergeant Salas to have his K-9 sniff the exterior of Ms. Lopez's car, which he did at approximately 3:08 p.m. (Tr. at 31-32.) At this point, Trooper Withers had not heard back from dispatch, completed the citation, or returned Ms. Lopez's documents to her. (Tr. at 35.)

Trooper Withers then asked Defendant Molina how long she had been in Las Vegas and, after hesitating, she said a few days or about a week. (Tr. at 31.) Trooper Withers also asked her when she and Ms. Lopez had left North Carolina, and she again hesitated before saying she did not know, and that she did not remember. (Tr. at 32.) At the request of Sergeant Salas, Trooper Withers then asked Defendant Molina to get out of the car so that Salas' K-9, Duke, could perform the sniff. (Tr. at 32.) Trooper Withers and Defendant Molina then walked off to the side of the car, about 30 feet from the shoulder of the road. (Tr. at 32.)

At approximately 3:08 p.m., nine minutes after Trooper Withers initiated the stop, Sergeant Salas deployed Duke. (Tr. at 32.) As Duke was sniffing the exterior of the car, Trooper Withers continued to talk to Susie Molina. (Tr. at 32.) Trooper Withers asked Defendant Molina for the name of the driver and she said it was "Sulay." (Tr. at 32.) He asked Defendant Molina how long she had known Sulay and at first she said she didn't know, but then said she had known her for a long time. (Tr. at 32.) Trooper Withers asked if it had been five

5

years or ten years, and Defendant Molina said it felt like it had been forever. (Tr. at 32.) When Trooper Withers again asked how long she had known Sulay, Molina said it had been years. (Tr. at 32-33.) Trooper Withers again asked Defendant Molina about leaving North Carolina and she said she wasn't sure when they left, but that they had been gone for two weeks. (Tr. at 33.) When he asked what day of the week they left North Carolina, Defendant Molina stated she didn't know. (Tr. at 33.) The trooper then asked for the date they left and Defendant Molina indicated that she did not know, because she was bad with dates. (Tr. at 33.)

Trooper Withers again asked Defendant Molina where she had stayed in Las Vegas and, almost before he finished his sentence, she quickly responded, "MGM." (Tr. at 33.) As Trooper Withers was talking with Defendant Molina, he was able to see Sergeant Salas as he was deploying his K-9. (Tr. at 33.) Trooper Withers watched Salas make a pass around the car and saw him stop for several seconds at the back corner of the car, on the driver's side. (Tr. at 33-34.) Sergeant Salas continued around the car again, and Trooper Withers saw him again stop at the rear tire on the driver's side. (Tr. at 34.) Salas then put his dog away. (Tr. at 34.)

Sergeant Salas described the deployment similarly. He stated that he and Duke walked up to the rear of the vehicle and Salas gave Duke the command to search for narcotics. (Tr. at 90-91.) The two began near the rear passenger tail light and walked around the vehicle. (Tr. at 91.) During the first pass, Duke stopped for a short time near the driver's side rear tire. (Tr. at 91.) On the second pass, however, Duke stopped at that location and indicated the odor of narcotics by scratching on the rear tire of the vehicle. (Tr. at 91.)

Trooper Withers then heard back from his dispatcher at approximately 3:10 p.m. (Tr. at 35.) Dispatch advised that Ms. Lopez's driver's license was valid and that she had no warrants or criminal history. (Tr. at 35-36.) Trooper Withers continued to speak with Defendant Molina

6

because he was suspicious of criminal activity.  (Tr. at 36.)  He asked Defendant Molina how long it had taken her and Ms. Lopez to drive from North Carolina and she said "a couple of days, about a week."  (Tr. at 36.)  He asked her if they had stopped along the way and when she said that they had, he asked her what hotels they had stayed at.  (Tr. at 36.)  She stated that she could not remember.  (Tr. at 36.)  Trooper Withers then asked what was the first state they had stopped in after leaving North Carolina and she asked, "The state?"  (Tr. at 36-37.)  When Trooper Withers affirmed that he was asking for the state, Defendant Molina said she had a bad memory and just did not know where they had stopped.  (Tr. at 37.)  Trooper Withers then returned to his patrol car.  (Tr. at 37.)  The time was approximately 3:11 p.m.  (Tr. at 37.)  At that point, Trooper Withers spoke with Sergeant Salas who was waiting near Trooper Withers' driver's door.  (Tr. at 38.)  Salas informed Trooper Withers that the dog had indicated to the driver's side rear fender well.  (Tr. at 38.)  After additional questions and observations, a hidden compartment in the wheel-well of the left rear driver's side of the car was found, and Ms. Lopez and Defendant Molina were at that time placed under arrest.  (Tr. at 44.)  After transporting the car to First Choice Automotive in Green River, a mechanic used an air chisel to remove the locking lug and the officers found 24 packages wrapped in electrical tape in a hidden compartment.  (Tr. at 45.)  A field test for cocaine tested positive.  (Tr. at 46.)

## ANALYSIS

To suppress evidence as the fruit of an unlawful detention, a defendant must make two showings: "(1) that the detention did violate his Fourth Amendment rights; and (2) that there is a factual nexus between the illegality and the challenged evidence."[1]  *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (citations omitted).  In determining whether the detention

---

[1] Because Defendant Molina fails to make the requisite first showing, an analysis of the second element is moot.

violated Defendant Molina's Fourth Amendment rights, the Tenth Circuit has instructed: "The Fourth Amendment reasonableness of traffic stop based on probable cause must be judged by examining both the length of the detention and the manner in which it was carried out." *United States v. Cline*, 349 F.3d 1276, 1288 (10th Cir. 2003).[2] This standard, however, does not completely prohibit or bar either unrelated questions or any extension or delay to complete the purpose of the stop. Rather, such delay must simply not be unreasonable. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (citing *United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005) ("A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed."); *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc) ("[Q]uestions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable".)).[3]

At the outset of the factual analysis, it is important to note that "[i]n determining whether a traffic stop is constitutional, the officer's subjective intent or good faith does not affect the reasonableness of the stop." *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) (citations

---

[2] Defendant Molina argues that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *citing Florida. v. Royer*, 460 U.S. 491, 500 (U.S. 1983). The Supreme Court has more recently reemphasized, however, the reasonableness standard. *United States v. Sharpe*, 470 U.S. 675, 687 (U.S. 1985) ("[T]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.") (citations omitted). *Sharpe* has recently been cited by the Tenth Circuit with the additional explanation that the length of the detention is to be judged by whether it is within an "objectively reasonable time" for the officer to have performed the "permissible investigatory tasks" associated with the purpose of the stop. *United States v. Burleson*, 657 F.3d 1040, 1049 (10th Cir. 2011).

[3] It is true that a passenger is also seized during a traffic stop. *See Brendlin v. California*, 551 U.S. 249, 255 (2007) (holding that automobile passengers are seized during traffic stops even though the police command to stop is directed to the driver because a reasonable person in the passenger seat would not feel free to leave once the police have stopped the vehicle). But, inasmuch as the seizure is based upon the actions of the driver, then so is the reasonableness of the seizure judged in light of the basis for the traffic stop. In other words, Defendant Molina must show that the seizure relating to the traffic stop was unreasonable. She has not done so.

omitted). Thus, because it is uncontested that the car had been stopped for speeding, the initial seizure was appropriate. Therefore, everything that happened prior to the legitimate stop that may have initially raised Trooper Withers' suspicion is irrelevant.[4]

Defendant Molina first argues that Trooper Withers unreasonably delayed her seizure by asking Ms. Lopez questions which were unrelated to the speeding offense. (Mem. Supp. Mot. Supress, 16.) She further argues that had Trooper Withers not "waited" the five minutes to request a report from dispatch, the information would have arrived before the K-9 had arrived, suggesting that the Defendants would have been free to leave and the narcotics would never have been found. (Mem. Supp. Mot. Suppress, 16.) In looking at the timeline of events, it becomes clear that this contention is factually not supportable.

Trooper Withers pulled Ms. Lopez over for speeding at 2:59 p.m. After Ms. Lopez offered an expired insurance card, Trooper Withers asked for a valid one at 3:01 p.m. When she responded that she did not have a valid insurance card, Trooper Withers asked her to return with him to his patrol car at approximately 3:02 p.m. There, Trooper Withers began filling out a citation on his computer and, just after 3:04 p.m., he asked his dispatcher to check Ms. Lopez's driver's license for any outstanding warrants or criminal history. Sergeant Salas arrived on the scene at 3:04 p.m. At approximately 3:07 p.m., Trooper Withers asked Ms. Lopez if he could speak with the passenger and she consented. As Trooper Withers and Sergeant Salas passed,

---

[4] Defendant Molina submitted evidence from which a reasonable inference could be drawn that Trooper Withers had targeted Ms. Lopez and Ms. Molina for the purpose of finding a technical basis for stopping them. Notwithstanding driving parallel to them for a couple of miles, he initially found no basis for a stop. Defendant Molina also argues Trooper Withers must have significantly exceeded the speed limit in order to position himself to clock their speed, just as the speed limit changed from 75 to 60 mph at the entrance to Spotted Wolf Canyon. In light of the fact that Sergeant Salas was already checking speeds at the same location, Trooper Withers was apparently waiting for Ms. Lopez's car in hopes that he could find a reason to stop the two young women. Trooper Withers' conduct may not have been completely consistent with the reasonable expectation of the way the driving public should be treated. Nevertheless, Defendant Molina does not point to any racial or other motives by Trooper Withers that would raise constitutional concerns. Defendant Molina does not contest that, regardless of whether Trooper Withers lacked a basis for reasonable suspicion prior to his radar check, he had a lawful basis for a stop at the time he pulled the car over.

Trooper Withers asked Sergeant Salas to have his K-9 sniff the exterior of Ms. Lopez's car. At this point, the purpose for the stop had not yet been completed.[5] During this time, Trooper Withers asked Defendant Molina questions regarding how long she had been in Las Vegas, when she and Ms. Lopez had left North Carolina, and other related questions. Sergeant Salas then deployed his dog at 3:08 p.m. Trooper Withers continued to speak to Defendant Molina, including asking questions about how long the two had known each other and when they left North Carolina. Both answers were vague. At 3:09:06 p.m., the dog indicated the odor of narcotics in the vehicle. Then, at 3:09:38, dispatch returned the requested information.[6]

Trooper Withers' "delay" in not contacting his dispatcher was not five minutes, but little more than two minutes, from 3:02 p.m. to 3:04 p.m. This time was spent asking general questions about Ms. Lopez's travel plans – a permissible line of questioning. *See United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011) (holding "that a law enforcement officer conducting a traffic stop may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate. In addition, an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop.") (citations omitted). To the extent that Trooper Withers repeated some questions, it was because he was getting vague answers. (Tr. at 23.) In any event, Trooper Withers' questioning amounted to no more than a few minutes. Defendant Molina has provided no citation that suggests that such a short amount of time, regardless of how

---

[5] *Compare with United States v. Conte*, No. 2:10-cr-767-CW, 2012 U.S. Dist. LEXIS 16470 (D. Utah Feb. 8, 2012) (finding that upon returning the driver's documents, the purpose for lawful stop had been completed and there was no basis to continue to detain the defendant. The defendant's subsequent consent to further questioning was not voluntary because, "a reasonable person . . . would not have felt free at that time to decline to answer trooper's questions and instead leave").

[6] Defendant Molina only challenges those actions taken prior to this time.

it was caused, is sufficient to find a violation of a passenger's Fourth Amendment rights. The court finds that the length of the Defendants' detention was objectively reasonable.

Defendant Molina further argues that "had [she] not been illegally detained, there is no reason why she would not be able to depart in the vehicle [because she] and Lopez had been friends for years and there is no indication that Lopez would have prevented Ms. Molina from taking the vehicle, and if need be, picking Lopez up at a later time." (Mem. Supp. Mot. Suppress, 16-17.) Although this argument turns entirely upon speculation, this is a moot point. Defendant Molina's seizure is an issue only it was unreasonable. Having held Trooper Withers' actions were reasonable, Defendant Molina's contention is rejected. Defendant Molina's Fourth Amendment rights were not violated.[7]

## **CONCLUSION**

For the reasons stated herein, Defendant Molina's motion to suppress is DENIED.

DATED this 15th day of February, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[7] Although unchallenged, the use of the K-9 was certainly permissible. "[T]he use of a well-trained narcotics-detection dog – one that does not expose noncontraband items that otherwise would remain hidden from public view – during a lawful traffic stop, generally does not implicate legitimate privacy interests," *Illinois v. Caballes*, 125 S. Ct. 834, 838 (U.S. 2005) (further stating that a "dog sniff . . . performed on the exterior of respondent's car while he was lawfully seized for a traffic violation . . . does not rise to the level of a constitutionally cognizable infringement").

11